# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No: 06 CR 850 |
| ) | |
| ANTHONY ROBINSON ) | Judge John W. Darrah |
| ) | |

## MEMORANDUM OPINION AND ORDER

Currently before the Court is Robinson's Motion to Suppress Unlawful Stop and Seizure of Evidence.

## BACKGROUND

The United States of America brought a two-count indictment against Defendant, Anthony Robinson, charging him with bribery, in violation of 18 U.S.C. § 666, and one count of attempted possession of cocaine, in violation of 21 U.S.C. § 846. On August 14, 2007, an evidentiary hearing was held on Robinson's motion.

Chicago Police Officer James Weyforth has been a Chicago Police Officer for fourteen years. During this time, Officer Weyforth has worked on hundreds of narcotic investigations. The narcotic investigations involved interviewing targets of the investigations and working with informants and undercover agents. Based on his experience, Officer Weyforth is familiar with the means and methods of narcotic traffickers.

In January 2006, police officers began investigating reported high narcotic trafficking and violent crimes connected to that trafficking in the Washington Park Homes (referred by gang members as the 5th Ward). In February 2006, Officer Weyforth joined the investigation of the criminal activity in the Washington Park Homes. Based on his prior experience, including

multiple arrests for narcotic offenses in the area, Officer Weyforth was familiar with gang activity in the area. Specifically, the Black Gangster Disciples "controlled" the area and were involved in the sale of heroin and rock cocaine. When Officer Weyforth joined the investigation, he was informed by the officers that had already been involved in the investigation that in the area there had been numerous undercover purchases of heroin in the area by juveniles.

Officer Weyforth's role in the investigating team was to identify subjects that were selling or holding narcotics. During surveillance of the area, Officer Weyforth, and others, observed in excess of ten juveniles conducting narcotic sales. Part of the investigation focused on a residential apartment building at 4556 South Vincennes. The police officers, including Officer Weyforth, observed and videotaped individuals selling narcotics, including individuals who had previously sold narcotics to undercover agents, frequently travel between the Washington Park Homes and 4556 South Vincennes. Only two of the over ten individuals that were under surveillance resided at 4556 South Vincennes. Based on the these observations, Officer Weyforth believed that individuals sold narcotics at or near the Washington Park Homes, brought the cash proceeds to 4556 South Vincennes, retrieved more narcotics, and returned to the Washington Park Homes to continue their open-air drug market sales of heroin. Undercover agents observed narcotic sales at 4556 South Vincennes.

Through Officer Weyforth's work with informants and arrests that he made in the area, as well as what other investigators had told him, Officer Weyforth learned that Robinson was a high-ranking member of the Black Gangster Disciples. On several occasions, Officer Weyforth observed Robinson in the Washington Park Homes area and at 4556 South Vincennes. While at these locations, Robinson engaged in conversations, while he was in his vehicle, with individuals

2

who had previously sold narcotics to undercover officers and other individuals who were suspected of selling narcotics. Officer Weyforth also observed Darryl Bennett direct juveniles to different areas near the Washington Park Homes and direct individuals to the juveniles, who would then sell heroin to those individuals. Officer Weyworth never observed Robinson's handling or dispensing cassette tapes, compact disks, records or CDs.

On March 23, 2006, Officer Weyworth, along with other police officers, were conducting surveillance in the vicinity of 4556 S. Vincennes. Earlier that day, a surveillance and case officer received information from an informant that there was going to be a large quantity of heroin delivered to 4556 S. Vincennes by an individual known as Tip. At approximately 1:30 p.m., *via* radio, a police officer advised Officer Weyworth that Tip arrived at, and entered, 4556 South Vincennes. At approximately 2:40 p.m., a white 4-door vehicle driven by Robinson stopped in the middle of the street in front of 4556 S. Vincennes. Bennett came out of 4556 S. Vincennes and entered the vehicle being driven by Robinson. Robinson and Bennett started driving eastbound toward Cottage Grove and then southbound on Cottage Grove. Police Officer Gary Turner followed Robinson and Bennett in an unmarked car and, subsequently, directed Officer Weyforth to stop the vehicle.

Officers Weyforth and Devilla stopped Robinson's car. As Robinson was pulling off the road, Officer Weyforth observed Robinson's leaning forward in the car, in what appeared as an attempt to either retrieve or conceal something from/at the floor or seat level. Both Robinson and Bennett were ordered to exit the vehicle, and a protective pat-down search was conducted of Robinson and Bennett. During the pat-down, over $2,000 in cash was recovered from

3

Robinson's front pants pocket; and over $1,800 was recovered from Bennett's pants' front pocket. The police officers questioned Robinson and Bennett about the money; Robinson stated that he obtained his money by selling bootleg CDs from his record business, and Bennett indicated that he was unemployed. Officer Weyforth did not observe any CDs in the vehicle or on Robinson's person. In light of the amount of cash, all in small denominations, and the above-stated conduct, Officer Weyforth believed that the money was proceeds from narcotic sales. Thus, Officer Weyforth decided to seize the money as suspect narcotic proceeds.

Officer Weyforth explained to Robinson and Bennett that he was going to seize the money and call for a narcotics dog to sniff the money at the 2nd District. He further explained that Robinson and Bennett should follow Officer Weyforth in their vehicle so they could get their receipts for the money seized. Neither Officers Weyforth nor Devilla told Robinson or Benentt that they were under arrest or that they had to come to the 2nd District. Neither Robinson nor Bennett were handcuffed or read their Miranda rights. Robinson and Bennett followed Officers Weyforth and Devilla in their own vehicle to the 2nd District.

At the 2nd District, both envelopes containing the money seized from Robinson and Bennett "sniffed" positive by the narcotics dog. While Officer Weyforth was processing the money to give Robinson and Bennett their receipts, Robinson suggested that Officers Weyforth and Devilla take half the money, give Robinson the car, and "everything would be good." Robinson also indicated that he needed "the police end of it" and that if Officer Weyworth helped him, he would take good care of Officer Weyforth and that they could both become rich men and retire. Robinson told Officer Weyforth that all he needed was information from the police department that Officer Weyforth could ascertain to protect his drug spot. Following the

4

conversation, Robinson and Bennett received the receipts for the seized money, walked out of the police station, and drove away in their vehicle. Immediately after Robinson and Bennett left the police station, Officer Weyforth contacted his supervisor and informed him about his conversation with Robinson.

On March 29, 2006, Officer Weyforth, while outfitted with an audio and video recorder, met with Robinson to investigate the bribery. Officer Weyforth asked Robinson what he meant during the prior conversation and what Robinson wanted Officer Weyforth to do. Robinson indicated that he needed a police officer to keep the heat off his workers and himself and to put pressure on a rival gang that was selling narcotics in his territory. Robinson told Officer Weyforth that he would be paid a "G" a week. Officer Weyforth's testimony as to the March 29 meeting is consistent with the recorded conversation between Officer Weyforth and Robinson.

Robinson was charged in the Illinois State Court for Cook County with bribery and possession of a controlled substance with the intent to deliver, based on allegations that over the course of a month Robinson allegedly paid money to Officer Weyforth as a form of protection. Further, during this time, Robinson and Officer Weyforth entered into negotiations for Robinson to purchase cocaine from Officer Weyforth. On May 3, 2006, Robinson allegedly delivered $5,000.00 to Officer Weyforth in exchange for 2 kilograms of cocaine to be delivered by Officer Weyforth. Immediately following the delivery of the 2 kilograms of cocaine, Robinson was arrested and taken into custody.

The state charges were later dismissed. On November 16, 2006, Robinson was indicted in federal court with bribery, in violation in 18 U.S.C. § 666, and one count of attempted possession of cocaine, in violation of 21 U.S.C. § 846.

## ANALYSIS

Robinson seeks to suppress the March 23, 2006 stop, the money found on his person, and any statements he made to police officers during the present investigation as fruits of the alleged unlawful stop and seizure.

An illegal arrest or other unreasonable seizure of a person is a violation of the Fourth Amendment. *Davis v. Mississippi*, 394 U.S. 721, 726 (1969). However, law enforcement officers may conduct brief investigative stops if there is "reasonable suspicion" of criminal activity. *Alabama v. White*, 496 U.S. 325, 329 (1990). The brief investigative stop, commonly referred to as a *Terry* stop, is lawful only if the police officer had a "reasonable suspicion supported by articulable facts" that the person stopped was engaged, or about to engage, in criminal conduct. *Terry v. Ohio*, 392 U.S. 1, 24; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United* States v. *Johnson*, 170 F.3d 708, 713 (7th Cir. 1999); *United States v. Jerez*, 108 F.3d 684, 689-95 (7th Cir. 1997). A reasonable suspicion "requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

Here, Officer Weyforth's brief stop of Robinson's vehicle on March 23, 2006, was supported by specific and articulable facts that support a reasonable suspicion that Robinson was engaged in, or about to engage in, criminal conduct. As fully set forth above, when Officer Weyforth made the traffic stop, he: (1) knew of ongoing narcotics in the area; (2) knew that juveniles selling the narcotics traveled between the Washington Park Homes and 4556 S.

6

Vincennes in conducting narcotic sales; (3) believed, based on experience, that juveniles were delivering narcotic proceeds to 4556 S. Vincennes and replenishing their drug supplies for further sales at 4556 S. Vincennes; (4) knew that the vast majority of individuals involved in the narcotic sales that frequented 4556 S. Vincennes were not living at that location; (5) knew that Robinson had been seen on multiple occasions at the Washington Park Homes conferring with the juvenile narcotic sellers and that he frequently went to 4556 S. Vincennes; (6) knew that Robinson was a high-ranking member of the Black Gangster Disciples, a gang whose main business was selling narcotics; (7) knew that a delivery of heroin was slated to be made at 4556 S. Vincennes that same day by Tip; and (8) knew that Tip arrived at 4556 S. Vincennes and that approximately an hour later, Bennett (who was known to direct narcotic sales in the area) was observed leaving 4556 S. Vincennes in the vehicle driven by Robinson. These facts provided Officer Weyforth, an experienced narcotics officer, a reasonable, articulable suspicion that Robinson and/or Bennett were engaged, or were about to engage, in criminal conduct. There was no evidence to find the stop was the product of an invidious motive.

Furthermore, even if Officer Weyforth did not have reasonable suspicion to make the initial traffic stop, Robinson's subsequent statements and conduct were sufficiently attenuated to dissipate the taint of any illegal conduct.

Three factors are reviewed in determining whether the causal chain between the illegal conduct and the subsequent statements or conduct has been sufficiently attenuated to dissipate the taint of the illegal conduct: (1) the time between the illegal conduct and the acquisition of the evidence, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *See United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997)

7

(*Green*). "In the final analysis, however, the question is whether the evidence came from the 'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Green*, 111 F.3d at 521, *quoting Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

The time between the traffic stop and Robinson's statement to Officer Weyforth at the police station on March 23, 2006, was relatively brief. However, the time between Robinson's statements and conduct after the traffic stop and the March 29, 2006 meeting with Officer Weyforth and the subsequent conduct, including the exchange of money and drugs, was six days to over a month later. On balance, this factor weighs in favor of attenuation.

The presence of intervening circumstances also weighs in favor of attenuation. Robinson's initial offer to bribe Officer Weyforth came after the brief investigatory stop of his vehicle was completed, while Robinson was voluntarily present in the police station. Robinson's later actionable conduct occurred well after his detention on the street had passed and while Robinson was at liberty.

Furthermore, Robinson's statements and conduct beginning March 29, 2006, would constitute a new and distinct crime during and/or after the claimed "unlawful detention." "When a defendant commits a new and distinct crime during an unlawful detention, the Fourth Amendment's exclusionary rule does not bar evidence of the new crime." *United States v. Hunt*, 372 F.3 1010, 1012 (8th Cir. 2004); *see also United States v. Pryor*, 32 F.3d 1192, 1195-96 (7th Cir. 1994). Thus, the statements and conduct beginning March 29, 2006, would not be barred.

8

## CONCLUSION

For the foregoing reasons, Robinson's Motion to Suppress is denied.

Dated: November 8, 2007

JOHN W. DARRAH
United States District Court Judge